DENEMARK *v.* ED B. MOONEY, INC.

4-9309                                                    237 S. W. 2d 41

Substituted Opinion delivered April 2, 1951.

Original Opinion delivered January 22, 1951.

*Earl J. Lane, Arvey, Hodes & Mantynband, Louis M. Mantynband* and *J. Herzl Segal,* for appellant.

*Hebert & Dobbs,* for appellee.

ROBINSON, J. The appellants herein, Mr. and Mrs. Emil Denemark, are residents of Chicago, and are partners owning a string of horses and operating a racing stable.

In the fall of 1948, they decided to build a stable near the race-track at Hot Springs, Arkansas, and had plans and specifications prepared by an architect in Chicago. Denemark brought these plans and specifications to Hot Springs and consulted with Mr. Joe McRae, Secretary-Treasurer and, apparently, Manager of the appellee Ed B. Mooney, Incorporated.

McRae gave Denemark an estimate of the costs of building a stable according to the plans and specifications which Denemark exhibited to him. The parties disagree as to the amount McRae estimated it would cost to build the stable. The plans also provided for living quarters for the grooms in connection with the same building. But, be that as it may, it is agreed that whatever price McRae gave Denemark, it was more than Denemark wanted to spend on the structure.

Denemark then returned to Chicago where he had other plans and specifications prepared for a cheaper barn and a two-story frame residence. After another meeting with McRae at Hot Springs, it was agreed that appellee was to build the structures. The parties are in hopeless disagreement as to the estimate that McRae gave as the cost. McRae says it was $37,817 for the stable and $9,500 for the house. Denemark says the estimate on the barn and house together was $26,500.

In any event, it was agreed that appellee was to construct the buildings on a cost-plus arrangement, either cost plus ten per cent or a straight fee. Denemark returned to Chicago and had his secretary, Mr. Frank J. Kotnour, send appellee $10,000 as part payment.

On November 18th McRae wrote to Kotnour as follows:

"This will acknowledge receipt of the check No. 4632 in the amount of $10,000 which is to be applied upon the costs of the construction of the house and stable

building now under construction by us for Mr. Denemark in Hot Springs, Arkansas.

"I am enclosing the daily report copies of the costs to date on the job, which has been set up on a strict actual cost basis plus 10%, with us to furnish all small tools (hand tools such as picks, shovels, mortar hoes, electric saws, vibrators and allied hand tools that would be used on the job), at no cost to the owner except for re-sharpening. This I discussed with Mr. Denemark when he was here, and he advised me to go ahead and we would agree on either this basis or a straight fee for my services, so I have set it up this way, and he and I will agree on the final figure at a later date when he is down here.

"On all purchases we will furnish you with the original copy of the purchase order with each report at the completion of the job, will furnish you with the invoices to cover same. In this way you will have a complete breakdown of the cost of the labor and material used in the construction of these buildings."

On the 27th of November, Denemark made another trip to Hot Springs at which time he authorized certain changes in the structures and the addition of a one-story bunk-house. McRae ·was unable to obtain the metal roofing and Denemark, at the cost of about $4,000, obtained it in Chicago, and paid for it.

On December 12th McRae wrote to Kotnour, Denemark's secretary, as follows:

"Enclosed please find the copies of the daily reports for the week ending December 10th together with the Estimate No. 4 and the cash statement to accompany same.

"I will try to give you an over-all picture of the progress of the job for the week as it stands today:

"Barn; all concrete block work 100% complete. Posts for stall framing all erected and cut to finished grade. Sills to carry loft floor are erected except circle corner at ends. Floor joists and loft floor 65% complete. Will complete Monday if we get a full day's work

without rain. Steel columns to carry roof section erected complete, all bolts set in walls and the concrete sill under window section ready for the steel. Steel for roof and roof materials will be delivered to the job complete on Tuesday of this week, steel workers all set to start Wednesday morning. Hardware for stall doors all in town, ready when needed.

"Big house: 80% completed; carpenters will finish installation of all sheet rock on walls and ceilings Monday, will start trim on windows and door frames sometime Monday; should start hanging doors in house by Wednesday and painter crew will start Monday to taping joints of sheet rock. Brick mason has the fireplace 70% complete—will complete Tuesday of this week. House will definitely be completed and ready before the 1st of January.

"Small house: Plumbing all roughed in, floor and foundation poured 100% complete, brick masons now laying exterior tile walls. Should complete all the walls and partitions this week.

"On an over-all picture of the job, barring as much as 4 or 5 days' rain between now and next Tuesday, one week from now, the entire project will be completed in time to use on the 1st of January, or shortly thereafter.

"One other thing that I imagine that Denemark is interested in will be the final anticipated cost of the entire project, which is of course impossible to guage accurately, but we are attempting to give your office a picture of the project as best we can.

"Project cost to date is ............$16,533.03
Cost of steel framing & roof erected for
    barn is ............ 12,500.00
Estimated costs to finish stalls & barn,
    bunkhouse & big house complete ......... 10,000.00

Total ............$39,033.03

"I do not think that the costs will vary more than 10% either way from the above estimate unless we get

other changes that we do not know about at the present time.''

On December 18th Denemark made another trip to Hot Springs at which time he authorized the addition of a one-half bath in the two-story frame house, a second story to the bunkhouse consisting of one room and bath, and the construction of a four-car garage.

On December 31st appellee sent Denemark a statement showing the cost of the project as $38,984.87, which included appellee's 10% commission. On January 5th appellee sent Denemark a statement showing the cost to be $54,737.05. When Denemark received this $54,737.05 statement, it was for more than he had anticipated. He immediately went to Hot Springs, arriving there on January 8th, and had a conference with McRae on the 9th, at the conclusion of which Denemark gave McRae a check for $19,737.05. Denemark states that he paid this under protest; that McRae assured him he would have an audit made of everything and if Denemark was entitled to a refund he would get it; that he was led to believe that he would get a refund. McRae states that the check for the additional $19,737.05 made a total of $54,737.05 paid by Denemark and was to pay for the labor and materials used on the project plus 10%, as shown by his Estimates 1 to 9 inclusive, and that it did not take into consideration any work or material used after January 6th, and that it did not take into consideration the bills of the sub-contractors. The painting, plumbing, steel and electrical work had been done by sub-contractors employed by appellee.

Finally, on the 4th day of March, 1949, appellee sent Denemark a bill for balance due of $18,309.60, which Denemark refused to pay. Then appellee filed suit alleging that the project cost $73,114.59, that $54,737.05 had been paid thereon, and there was a balance due of $18,377.54, for which it asked judgment.

Later on an Amended Complaint was filed in which it was alleged that the correct balance due was $556.87

in addition to the amount sought in the original Complaint.

Denemark filed an Answer and Cross-Complaint denying that he was indebted to plaintiff in any sum and alleging that the total value of the labor and material used in the project did not exceed $40,000, and that, as a matter of fact, due to the unskillful, improper and defective manner in which the buildings were constructed, they were not worth more than $35,000; that they had over-paid the plaintiff $19,737.05, and prayed that an accounting be taken of the damages suffered by the defendants, and that they have judgment for whatever amount that might be found due.

Later the defendants filed an Amendment to the Answer in which they allege that they disputed the amount of $54,737.05, for which plaintiff had rendered a statement on January 6th, and that they had compromised and settled their dispute by defendants paying to the plaintiff $19,737.05, making a total of $54,737.05 paid by the defendants, and that the parties agreed that the cost to the defendants would not exceed that sum.

O. C. Green, doing business as O. C. Green Lumber Company, filed an Intervention in which he claimed $565.94 was due him for material furnished on the project, and that such amount was included in the amount for which plaintiff was asking judgment.

The Chancery Court found for the plaintiff in the sum of $18,368.47, subject to credits in favor of the defendants as follows: $247.97 for four heating stoves furnished by Brennan Plumbing Company for use in residence building; $105.47 for Social Security overcharged by the plaintiff; $505.84 for Contractor's Liability Insurance overcharged by the plaintiff; and 10% thereon; $830 for repair and restoration of a floor of the residence building located on the property; $500 for repair and restoration of the roof on the barn building; $150 for pointing up the concrete block walls of the stable; $186 for charge made by the plaintiff for hauling workmen to the job; $40 for repair

and restoration of the roof of the porch on the residence building; $150 for repair and restoration of the sewerage system, making a total credit to be allowed the defendants of $5,652.23, and that the plaintiff have judgment against the defendants in the sum of $12,716.23, and that the Intervener O. C. Green have a lien in the sum of $565.94 for materials furnished.

The defendants appealed to this Court. The plaintiff took a cross-appeal contending that the Chancellor was in error in not allowing the plaintiff a charge of 4% as overhead.

The rule is that the findings of the Chancellor will not be reversed unless against a preponderance of the evidence, and this Court has held many times that where the Chancellor's findings are against the preponderance of the evidence, the case will be reversed. *Chapman* v. *Liggett,* 41 Ark. 292; *Leifer Manufacturing Company* v. *Gross,* 93 Ark. 277, 124 S. W. 1039; *Carr* v. *Fair,* 92 Ark. 359, 122 S. W. 659.

The record in this case is voluminous. It consists of 8 volumes; appellants' abstract of the testimony requires 393 pages. We have carefully studied the entire record and briefs of the parties, and we are of the opinion that the Chancellor's findings are contrary to the preponderance of the evidence.

In the first place, the undisputed evidence is that the first estimate made by McRae was for more than Denemark wanted to spend. McRae says that the first estimate was for one amount and Denemark says it was for another, but, regardless of their disagreement as to the amount of the estimate, it is agreed that McRae's estimate was for less money than finally paid by Denemark and more than he wanted to spend. This is important only to the extent of whatever light it sheds on the intentions of the parties.

On December 12th, when the project was within one week's work of being completed, McRae wrote to Denemark: . . . "On an overall picture of the job, barring as much as 4 or 5 days' rain between now and next Tues-

day, one week from now, the entire project will be completed in time to use on the 1st of January or shortly thereafter". The letter is ambiguous in that it can be construed to mean that the entire project will be completed "by next Tuesday", one week from the time that the letter was written unless they had "as much as 4 or 5 days' rain". On the other hand it could mean that if they did not have as much as 4 or 5 days' rain, it would be completed by the 1st of January or shortly thereafter. It was near enough to completion for McRae to be able to tell within 20% of what the final cost to Denemark would be, and in his letter of December 12th his estimate of the final cost was $39,033.03. He had figured it down to the penny. In that same letter he stated that he did not believe that the cost would vary more than 10% either way from that figure, giving himself a leeway of 20%.

It is true that on the 18th day of December, Denemark authorized an addition of a one-half bath to the residence, a second story consisting of one room to the bunkhouse, a four-car garage, and a few small items, but the record does not justify a finding that these additions cost in excess of $11,800.72 over and above McRae's top estimate of $42,936.33, (10% more than $39,033.03), which sum together with $11,800.72 is the amount that Denemark actually paid: $54,737.05. In addition Denemark spent $4,000 on the metal roofing.

We think the preponderance of the evidence shows that for all practical purposes the project was completed on the 6th of January, with the exception of a little work to be done on the garage and a few odds and ends.

In McRae's testimony he states:

"Q. Was there any agreement existing between you and the defendants with reference to the time this job should be completed? A. Yes. Q. State to the Court what that agreement was. A. He wanted us to get it done by January 1st and we agreed to make every effort to do it; and did so. Q. When did you turn possession of the premises over to the Denemarks? A. As far as the stable and the frame house and the tile residence—part

of his horses came in on the 6th of January, and the rest of them on the 7th.

. . . . . . . . .

"Q. The accounts which you have filed here indicate considerable overtime. Did you have to work on holidays and on Sundays on this job? A. We had to work every available minute we could in order to complete the job. Q. And did you do that? A. Yes—we missed it by 6 days. Q. You missed the completion by January 1st by 6 days? A. That is right."

We believe that a preponderance of the evidence shows that it was intended by both parties that the $19,737.05 paid by Denemark on January 9th was a final payment on the job. On January 19th, ten days after the payment on the 9th, the appellee sent Denemark the following affidavit:

"I, Bernice McRae, certify that I am the duly elected and acting President of Ed B. Mooney, Inc., and Arkansas Corporation with principal offices at Hot Springs, Arkansas. I further certify that beginning on the 15th day of November construction was started on the Denemark stables and homes, and that on the date of January 6, 1949, we had submitted Estimates No. 1 to No. 9 inclusive, for work done and material supplies up to and including the date of January 6, 1949, said estimates having daily report sheets and partial audits supporting the estimates, and that on the date of January 8th, we received payment of Estimate No. 9 in the amount of $19,737.05, which made a total of $54,737.05, spent on the job up to and including the date of January 6, 1949, and that there are no outstanding bills due for labor or material used on the job between the dates aforementioned.

"/s/ Bernice McRae, President

Ed B. Mooney, Inc.,

General Contractors.

"The above statement subscribed and sworn to before me on this the 19th day of January, 1949.

"/s/ J. G. McRae
Notary Public."

In the first letter written by McRae to Kotnour, Denemark's secretary, on November 18th, McRae had stated: "I am enclosing the daily report copies of the costs to date on the job which has been set up on a strict actual cost plus 10% with us to furnish all small tools . . . This I discussed with Mr. Denemark when he was here and he advised me to go ahead and we would agree either on this basis or a straight fee for my services, so I have set it up this way, *and he and I will agree on the final figure at a later date when he is down here.*" (Italics ours).

Moreover McRae testified as follows:

"Q. At the time he gave you this check for $19,737.05, then did you promise to send him anything? A. He says 'I have given you an awful lot of money and just for my protection how do I know you are going to pay these bills?' I said 'Mr. Denemark, under state laws a contractor is required upon the completion of the job to give you a lien waiver showing that all bills for labor and material have been paid in full.' I said 'if we fail to give you that and somebody brings a bill up, then it would be our responsibility and not yours.' He said 'I would like to have one.' I said 'Allright. When I pay the bills that are included in this estimate I will prepare you a lien release on this much of the work, and when we are through and you get the final bill, I will send you one showing everything is paid for.' "

This conversation was held on the 9th day of January, two or three days after, according to McRae's own testimony, the job was completed. He had testified that they had promised to finish the job by January 1st and, as a matter of fact, finished it six days later. At the time of this conversation of January 9th, Denemark made a payment of $19,737.05, and was insisting that he be

furnished something showing that all the bills had been paid, and McRae did furnish an affidavit of Bernice McRae, his wife and President of Ed B. Mooney, Inc., to the effect that there were no outstanding bills due for labor or materials used on the job between the dates of the 15th of November and January 6th inclusive.

McRae claims that the affidavit dictated by him and signed by his wife, President of the appellee corporation, on January 19th in which it was stated that there were no outstanding bills due for labor or materials used on the job between November 15th and January 6th inclusive, did not apply to any debts that may have been owed to sub-contractors. McRae's statement in this respect is contrary to the preponderance of the evidence. He must have taken these items into consideration when he wrote to Kotnour on December 12th giving his estimate of the final cost as $39,033.03, not to vary over 10% one way or the other.

The sub-contractors' bills for work authorized by Denemark on December 18th could not have increased the bills a great deal compared to the total cost of their work. He certainly took the Arkansas Foundry's bill into consideration because that was specifically set out in his estimate made on December 12th, in which the amount was stated as $12,500.00. As a matter of fact, the Arkansas Foundry's bill for material and labor was $11,403.46. The Arkansas Foundry's labor bill was dated December 31, 1948. The dates on some of the Akers' electrical bills are missing from the top of the bill-heading, and other of the Akers' bills are dated December 12th and January 1st. The only substantial amount of work apparently done by Akers and material furnished after January 7th was on the garage and that amounted to $193.90. Brennan's Plumbing Company bills are dated from December 3, 1948, to January 1, 1949, with one bill dated "1/25/49" and marked "for extra work $579.14," $466.63 of which was for a jet pump and storage tank. The Maddox bills for painting are dated from December 4th to December 31st, and it appears

that he did work amounting to about $108 after January 7th.

After McRae's letter to Kotnour on December 12th, Denemark had every right to believe that the structures were going to cost not over $42,936.33, which is 10% more than $39,033.03, with the additional sum of whatever the half-bath in the two-story house, the four-car garage, and the second story consisting of one room addition to the bunkhouse would cost. Only six days after he had received a bill for $38,984.87 Denemark received another bill under date of January 5th for $54,737.05.

It is true the record shows that the Akers, Maddox and Brennan bills for work done and materials furnished subsequent to January 6th amounted to $880.04, but, the Chancellor found that the Denemarks were entitled to credits in the total sum of $5,652.23 because of defective work. When everything is taken into consideration the project cost the appellants $54,737.05 paid to appellee, $4,000 for roofing, and $5,652.23 to correct defects, making a total of $64,389.28. The record does not justify a finding in favor of appellees for any sum in addition to the amount heretofore received; neither do we hold that the appellants should recover any sum from appellees. Thus, the project will then have cost appellants the aforesaid approximate sum of $64,389.28.

O. C. Green is entitled to a lien against the property for $565.94, but, since we are holding that appellee Mooney has been paid in full including Green's account, the appellants may have their remedy against appellee Mooney for whatever sum is paid in satisfaction of Green's aforesaid lien.

On the cross-appeal the Mooney Corporation contends that the Chancellor erred in not allowing it a charge of 4% as overhead and 10% thereon as cost-plus. The Chancellor's ruling denying the appellee's contention in this respect is in accordance with the weight of authority. 17 C. J. S. 827; 9 Am. Jur. 15; *Lytle, Campbell & Co.* v. *Sumners, Fiddler Todd & Co.*, 276 Pa. 409,

120 Atl. 409; *Mailanders* v. *Continental State Bank of Beckville,* 11 S. W. 2d 615.

The cause is reversed with directions to enter a decree not inconsistent with this opinion, the appellee to pay the costs of this appeal.

GRIFFIN SMITH, Chief Justice, dissenting. When the decree was reversed January 22d on a majority finding that an accord had been reached between the parties, with satisfaction, the dissents of the Chief Justice, Mr. Justice McFADDIN, and Mr. Justice GEORGE ROSE SMITH were noted. In expressing disagreement the Chief Justice said:

"The appeal is being disposed of on the ground of accord and satisfaction when most of the testimony shows that nobody was satisfied and that accord did not assume the dignity of a whisper. Clear inferences to be drawn from a case heard originally by one of the state's most careful chancellors is that Denemark [whose wife operates a string of racehorses] had more money than business sense, and chief concern [of the Denemarks] was to implement their contact with the race track racket as expeditiously as possible; hence their urge was predicated primarily upon speed to the full extent that dollars could produce that result. Changes in plans were made from time to time, but always there was the cost-plus consideration; and the final reckoning required payment of actual construction outlay with ten percent to the contractor. It is urged that sub-contracting—such as wiring, plumbing, and specialized work—could not be included for commission purposes. Certainly it was contemplated that Mooney would be paid over-all on the basis of ten percent of the finished product; and while a few items possibly amounting to $3,000 [may have been] erroneously included and should have been added to deductions made by the Chancellor, it is not necessary in this dissent to burden the record with a discussion regarding them, since by a process of reasoning satisfactory to the majority there has been a finding that what appears to me to have been discord between the parties

was an amicable adjustment sustained by a preponderance of the evidence.''

On rehearing the majority's decision that an accord had been reached and that payments mentioned satisfied the entire obligation, was withdrawn, and on April 2d, 1951, there was a substituted opinion. A reference to the opinion printed in The Law Reporter January 22, and that appearing April 9, 1951, will disclose the majority's action in receding from the theory of accord and satisfaction and finding that the Chancellor was not sustained by a preponderance of the evidence. Again the same three justices dissented.

Briefly, the facts are that the Chancellor heard many of the witnesses, patiently listened to their direct testimony and cross-examination, and concluded that Denemark and his witnesses were not to be believed regarding some of the transactions. Certainly there were conflicting factual issues, and in the final analysis the trial court had to accept the testimony thought to be credible and reject what appeared most unreasonable. With relatively slight variations mentioned in my dissent of January 22d it seems to me that by far the stronger case was made by Mooney, hence I am unable to fathom the mathematical and factual processes by which this Court's majority reached the conclusion that the decree was erroneous in all of its aspects not clearly favorable to the race track operators whose need for speed in construction patently outbalanced their financial judgments.

ED. F. McFADDIN, Justice (Dissenting). I am now compelled to dissent *twice* in the same case. On January 22nd, 1951 the Supreme Court delivered an opinion in which it reversed the trial court. The basis of the Supreme Court's opinion was, that there had been an accord and satisfaction between the Denemarks and Mooney when, on January 9, 1949, Mr. Denemark had paid the $19,737.05. Three Justices (the Chief Justice, Justice GEORGE ROSE SMITH, and myself) dissented, because we could not find, in the evidence, sufficient facts to substantiate the ''accord and satisfaction'' theory. To the majority opinion of January 22nd, 1951 Mooney filed

a petition for rehearing, showing the absence of the essentials of "accord and satisfaction." The petition for rehearing remained under submission until April 2nd, 1951, when the majority delivered the present opinion to which there is a dissent by the same three Justices— i. e. the Chief Justice, Justice GEORGE ROSE SMITH, and myself.

The only real difference between the majority opinion of January 22nd and the majority opinion of April 2nd, is a deletion, in the latter opinion, of all reference to "the accord and satisfaction." No other legal principle is substituted for such deletion, so that now the majority has reversed the Chancery decree and has stated no legal principle for so doing.

Specifically, near the end of the present (April 2nd, 1951) opinion there is a paragraph reading:

"After McRae's letter to Kotnour on December 12th, Denemark had every right to believe that the structures were going to cost not over $42,936.33, which is 10% more than $39,033.03, with the additional sum of whatever the half-bath in the two-story house, the four-car garage, and the second story consisting of one room addition to the bunkhouse would cost. Only six days after he had received a bill for $38,984.87 Denemark received another bill under date of January 5th for $54,737.05."

Every word of the April 2nd opinion, from the beginning down to the above quoted paragraph, is exactly the same as in the opinion of January 22nd, 1951 and contains all the statement of facts. On such statement of facts the majority, on January 22nd, decided there was an "accord and satisfaction." But when convinced on rehearing, as it evidently was, that the stated facts did not contain the essentials of accord and satisfaction, the majority has, in lieu of such theory, substituted the four concluding paragraphs of the present opinion, in one of which paragraphs this language appears:

"When everything is taken into consideration the project cost the appellants $54,737.05 paid to appellee, $4,000 for roofing, and $5,652.23 to correct defects, mak-

ing a total of $64,389.28. The record does not justify a finding in favor of appellees for any sum in addition to the amount heretofore received; neither do we hold that the appellants should recover any sum from appellees. Thus, the project will then have cost appellants the aforesaid approximate sum of $64,389.28.''

The language last quoted is the only language in the opinion that attempts to give any reason for reversing the Chancery decree; and that language merely says that $64,389.28 was enough for the Denemarks to have to pay for what they received.

I submit that no Chancery decree should be reversed until and unless the reviewing Court is able to point out some express basis in law or in fact for such reversal. In this case the Chancellor spent several days, seeing witnesses and hearing evidence, and reached a definite conclusion: yet this Court is reversing the Chancery decree upon the mere *ipse dixit* that the appellant should not prevail. I am thoroughly familiar with the rule that the Arkansas Supreme Court is not required to deliver written opinions. Such has been the law since *Vaughn* v. *Harp,* 49 Ark. 160, 4 S. W. 751. But when the Court does deliver a written opinion, it should state the applicable rules of law and pertinent reasons for the Court's conclusion: this, because when a written opinion is delivered it becomes a guide for future cases. As is clearly stated in 15 C. J. 968:

''It has been considered, however, that even though an opinion is not required by statute, one should be written where the case involves the application of an old principle. . . .''

Such is the situation here. The trial court is being reversed and yet the majority has been unwilling to assign any reason for such reversal, except that $64,389.28 is enough money for appellants to pay.

It is my view that the decree of the Chancery Court should not be reversed unless and until either (1) a legal principle can be stated to sustain the majority view or (2) a mistake of fact can be demonstrated in the Chan-

cery decree. The majority opinion in the case at bar does neither of these. Therefore, I respectfully dissent from the reversal.